The opinion of the court was delivered by
Manning, C. J.
This is a revocatory action, in which the plaintiff seeks to annul a sale from Wilson to his co-defendant Ingraham of certain lands, and the sale of one half the same property by the latter to one Davis, also a defendant. Wilson owed the plaintiff over two thousand dollars. The debt was originally due the law firm of Sparrow & Montgomery, of which plaintiff was a member, and was acquired by him by transfer.
Wilson made the sale to Ingraham on Nov. 28,1874, the price being $10,000, of which one tenth was cash, and the residue was payable in four equal annual instalments. In less than a week, Ingraham sold the -undivided half to Davis for five hundred dollars cash, and Davis as *197 sumed the payment of one half of Ingraham’s notes. Wilson removed' to Texas shortly afterwards.
The petition alleges an intention by the debtor and vendor to defraud — the knowledge by the successive vendees of that intention, and their co-operation in effecting the fraud — and the accomplishment of the purpose through a sale of all the debtor’s property, and the placing the proceeds thereof beyond the creditor’s reach.
If the plaintiff has succeeded in sustaining these allegations by satisfactory proof, he will be entitled to a revocation of the sale, for it is not to be tolerated that a debtor shall be able to alienate all that he has to pay his creditor with, and his vendee, a participant in his fraud, shall reap benefit from the wrongdoing, and the creditor shall have no redress.
Ingraham avers in defence, that he bought in open market, in good faith, and for a valid consideration, and Davis reiterates these averments for himself. Wilson denies fraud, and alleges that, being desirous of removing from this State and establishing himself in a new country, he offered his property to divers parties for the same price at which he afterwards sold to Ingraham, and among the persons to whom he thus offered to sell was the present plaintiff, who refused it. Had he stopped there, the answer would have been straightforward and unobjectionable, but he adds — “ the notes sued on were obtained without consideration and the signature thereto obtained through fraud and duress.”
The notes were executed by him to Sparrow & Montgomery to defend him from an indictment for murder, and there is not a line of proof in the whole of the voluminous testimony to support the shameless pretence that the fee was not promised willingly by the imprisoned accused, or that his benefactors, who gave their time, character, and learning, successfully to his defence, extorted from his necessities what was but the guerdon of their services.
•The Code has consecrated certain fundamental principles of equity touching the relations of debtor and creditor, and the acts which may not be done by the one so as to affect the interests of the other. Thus it says, that every act done by a debtor with intent of depriving his creditor of the eventual right he has upon the property of such debtor is illegal, and ought, as respects such creditor, to be avoided, art. 1961. But only those contracts of the debtor can be avoided that are made in fraud of creditors, and such as would actually defraud them, if carried into execution, for if they are made in good faith, they cannot be annulled, even though they may prove injurious to creditors; and if in bad faith, they cannot be rescinded unless they operate to their injury art. 1973. new nos. 1969 and 1978.
' And as to those, with whom the debtor has made “the contracts, if *198 the contract be onerous, but made in fraud on the part of the debtor, but in good faith on the part of the person with whom he contracted, if the value of the property transferred by such contract exceed by one fifth the price or consideration given for it, the creditors may annul it, and take back the property on paying the price with interest. But if the person, with whom the debtor contracted, be in fraud, as well as the debtor, he shall not be entitled to a restitution of the price, when the contract is annulled, except only to so much thereof as he shall prove has enured to the benefit of the creditors by increasing the value of the property, arts. 1976 — 7. new nos. 1981- — 2.
So Marcadé — il faut que l’acte, pour pourvoir étre revoqué, ait nui au cróancier et ait été fait frauduleusement. II faut d’abord que l’acte ait nui au cróancier, en causant ou augmentant l’insolvabilitó du debiteur, car, si celui-ci n’était devenu insolvable que plus tard, ce ne serait plus l’act lui-méme, mais telle ou telle circonstance postérieure, qui aurait causé la perte. II faut en outre qu’il y ait en fraude du dóbiteur, c’est-a dire qu’il ait accompli l’acte sachant le tort qu’il causerait a ses cróanciers, connaissant son insolvabilite. Exp. du Code Napoleon to. 4, «487.
It appears that the- act of sale from Wilson to Ingraham did not include the whole of the land, a small strip of the tract lying just above Lake Providence having been left out, not by design but through misdescription. Magruder, a judgment creditor of Wilson, seized this outlying strip in Dec. 1875. Ingraham and Davis injoined the enforcement of this seizure, alleging that the conveyance from Wilson did include that strip, and that their title, derived from him, transferred the ownership of the whole property to them. The plaintiff was the lawyer of Ingraham and Davis in this injunction suit, signed the petition, assisted in conducting the .trial. The injunction was dissolved. Ingraham and Davis plead now the estoppel by conduct against the plaintiff. This suit of Magruder was in the parish court, and was appealed to the District court, but before hearing, Davis paid Magruder’s judgment either from his own funds, or from funds furnished by parties interested, and in May 1876 Wilson made a supplemental deed, conveying to Ingraham the strip of land, and reciting that it was the intention of both parties to include it in the sale of 1874, and thus effectuating their will and understanding. No additional price was paid or stipulated. The present suit was instituted after the date of this second deed.
The evidence is entirely satisfactory that there was no fraud on the part of Ingraham or Davis. Wilson’s desire to sell, and intention to sell, was not a secret. The lawyers of the village all knew of it, and the offer was made to some of them. E. E. Montgomery, one of plaintiff’s counsel, was told by Ingraham that the property could be bought *199 very cheap, and thinks $7,000 was mentioned as the sum — that Wilson was determined to sell, and wanted to give him (Ingraham) the preference, and Ingraham wanted him (the witness) to go in with him, and that he took “the matter under advisement, and tried to get Mr. Delany to go in, but received' no encouragement from him, and owing to the great uncertainty about the value of any kind of property here then, I let the matter drop. An additional reason was, I did not care to go in debt.” One of the reasons assigned, he thinks, for Wilson’s desire to sell was his alarm about the Sparrow debt, and the impression made upon the witness by Ingraham at this interview was, that Wilson wanted to get rid of the Sparrow debt. He adds, “ Mr. Ingraham did not communicate to me any intention or desire to defraud Gen. Sparrow, or any other creditor of Wilson. He said he had advised Wilson to go to Gen. Sparrow and make some satisfactory arrangement. I recollect once, I think very soon after the institution of this suit, I proposed to Mr. Ingraham to buy his interest, and tried to get him to fix his terms. After thinking of it a day or two, he told me he declined to sell, because Dr. Davis was not willing. I was sorry I did not go into this arrangement for the purchase of this property, but I did think it a good trade, and was willing to buy from Ingraham.” The witness intended, in the event of purchasing, to compromise the ‘ Sparrow debt,’ now held by the plaintiff.
Mr. Delany, also counsel for plaintiff, repeats the statement that In-graham before his own purchase apprised him and his law partner that “ this property could be purchased from Wilson for a small sum, and wanted them to go in with him and purchase it.”
Wilson swears that he offered to sell to the plaintiff, but the plaintiff states unequivocally that he has no recollection of such offer. Wilson states the offer thus ; — “ I made a written proposition to Gen. Sparrow proposing to take $10,000 for it (the property) taking the notes he had against me as part payment, and $2,000 in money, the balance in one, two, and three years with interest from date. He, Sparrow, refused the proposition and referred me to J. W.- Montgomery his partner. I then made the same proposition to him and he also refused to accept it. I told them both that I was going to sell the property. I made to Sparrow and Montgomery the first offer.”
Ingraham’s testimony is copious, and it has the ‘ring’ of honesty. His physical infirmity does not appear to have abraded his moral sense. Only a part of the testimony can be transcribed.
“ I had been trying to get Gen. Sparrow to buy Mr. Wilson out for about a year; requested Wilson to go to Gen. Sparrow’s house, not his office, that I thought the General would do what was right. Mr. Wilson returned. Told me he had seen the General. I then went and *200 saw Gen. Sparrow myself, and asked him if Wilson had been there. I asked the General, why he did not buy his property, — that Wilson was in trouble and wanted to leave this country, after getting clear of the murder scrape. He replied, “ Wilson asked too much for his property, and I’m too old to go in debt.”
The General did not tell me what Wilson charged him for the property. Wilson had been asking ten thousand dollars for the property. Gen. Sparrow said he would see Judge Montgomery, may be he would buy it; that closed the interviews. Mr. Wilson said he could not get Gen. Sparrow to buy his property; he had offered it to me a year before I purchased it. I think it was generally known that Wilson was trying to sell his property and go to Texas. I told Gen. Sparrow, that Mr. Wilson had been in trouble and wanted to sell his property and go to Texas. Mr. Wilson was quite a young man. I had understood from a friend of Mr. Wilson’s that he would take seven thousand ($7,000) dollars for his property. I went to the office of Messrs. Montgomery & Delany, and told them what I had heard; that he would take seven thousand dollars for his property, and proposed them to go in and we would buy it of him. Messrs. Montgomery & Delany were both present, they declined the proposition, saying the property was worth little or nothing, they could never sell the lots ; the plantation was in a bad fix, which it was — no fence, ditches being filed up, and it was a cocoa patch, which it was. I talked with Gen. Sparrow about Wilson being greatly alarmed about his, Sparrow’s debt, it was so large ; he Wilson could never pay it without selling his property. When I bought this property from Mr. Wilson, he told me he would pay every dollar he owed in this parish. Called Judge DeErance in to witness the promise to me, as I would not have anything to do with the sale if there was anything wrong in it, which I told him. I told Mr. Wilson that if there was any fraud in this sale I would have nothing to do with it. He said to Judge DeErance, “ Judge, I am selling out to pay my debts,” that he would pay every cent he owed before he left the country. I consider the price I was giving Mr. Wilson for the property as a very high price at the time of the sale. I understood that Mr. Wilson owed nothing, except a debt of about $2,000 to Gen. Sparrow. He said the price I was paying him for the property would be ample to pay all his debts, and give him means of subsistence in Texas. At the time of the sale Wilson was not insolvent, the price I gave him for the property was a good deal more than what he owed. I have known Gen. Sparrow for about thirty years, and have been intimate personal friends for twenty years, and am still a warm friend of his. I never had any motive or desire to defraud Gen. Sparrow, or Judge Montgomery, or impede the collection of their debt against Wilson or. any one else. When I purchased the *201 property, I had no impression of any motive on the part of Wilson to defraud either Gen. Sparrow or Judge Montgomery. He had stated to me he would pay every dollar he owed before he left the parish. I told Mr. Wilson that if I had the least idea of any intention on his part to defraud Gen. Sparrow or Judge Montgomery, or any one else, that I would have nothing to do with his property. I have been living in this parish thirty-ñve years. I have been engaged in managing the largest plantation in this parish for others, and have been a planter myself since I have been here. I had a large acquaintance among the old settlers, and I believe I know most every body that’s here now. I have always thought that I enjoyed the confidence of the people of the parish, ever since I have been here. I have had a great many business transactions with the people of the parish of Carroll. This is the first time since I lived in this parish of Carroll that I have been dragged before the courts on a charge of fraud. I paid one thousand dollars cash money, and Major Oliver counted the money. I have always been able to make moneyed arrangements, and believe I am abundantly able to buy the property.”
This testimony was objected to, but properly admitted, as being in rebuttal of that offered by plaintiff, and responsive to tbat part of the defence which repelled the charge of fraud. Without going into a recital of the testimony relative to Davis’ alleged participation in the fraud charged, it is sufficient to say that the evidence in its entirety satisfies us that Wilson had made up his mind to go away, and this removal, determined on with deliberation, was carried out with persist-ency. “I had gone out to Texas the July previous to look out a location to move to, and had made my arrangements to remove there. I had been involved in personal difficulties and trouble, and I felt that a change of association and location would be to my advantage.”
The execution of this fixed resolve to get away from his surroundings was obstructed, or delayed, alone by his inability to sell his property. He tried to sell it to Gen. Sparrow, and pay the debt now owned by plaintiff as part of the price. Gen. S. then owned one half of the debt. He tried to sell to others, and notably to lawyers who held a claim against him. No one would buy. No doubt his desire for removal became morbid. His words above quoted shew it was not a transient notion, but a fervent desire. He offered to sell to Ingraham, and Ingraham offered inducements to others to buy along with him. Everybody had a chance to buy cheap, but nobody would buy, until finally Ingraham closed the negotiation and bought. Then everybody found out that the property had been sold for a bagatelle, compared with its real value, and many believed it had been sacrificed.
The same thing occurs every week here. The witnesses who fixed *202 the value of this property at (one of them as high as) $19,000, forget that the value of property in legal phrase is what it will sell for, and that the witness himself could have bought it for $7,000 and refused it. Gen. Sparrow would not buy it, because he would not encumber himself, even though an opportunity was afforded to realize the debt due to his partner and himself, and Mr. F. Montgomery was afraid of debt, and besides the value of all property was very uncertain. What appeared cheap that year might prove to be an onerous bargain the next year. Mr. Delany took the same view. The two witnesses, Sutton and Murfee, bought single lots at large prices, which form no criteria of the market value of the whole. Every one, to whom the offer to buy was made, knew that he could sell a single lot here and there for an enhanced price, but for all that he did not choose to try the speculation, because there were so many risks to run, and the future was so uncertain. The assessment was $6,000, and though that is not of itself proof of value, it is a fact worthy of note along with others tending the same way.
Sales cannot be disturbed upon hypothetical valuations or estimates of property, or upon the diminution of the price below what witnesses think it ought to have brought, or below what its actual value may be supposed to be. Its actual value as a saleable commodity is conclusively shewn to be the sum it actually brought in open market, with free competition, and fair opportunity to all comers to bid.
The fact that Wilson has not paid the debt to the plaintiff, which every consideration of honor and honesty demand should be paid, is an unfavourable and prejudicial fact to him. But the sale was not made with the intent of depriving his creditor of his eventual right upon the property. On the contrary he sought at first to enable the creditor to realize that right, nor was the party who contracted with him in bad faith, nor the price other than what it had been offered at without success. The plaintiff, upon this state of facts, proved with detailed circumstantiality, is not entitled to have the sale revoked.
The judgment is affirmed as to Ingraham and Davis, but must be reversed as to Wilson, and one of nonsuit entered.
The land was attached as the property of Wilson, and process of garnishment was taken against Davis. The plaintiff sued upon the notes, and an absolute judgment in Wilson’s favor might be pleadable in bar of a future pursuit of him. Therefore.
It is ordered and decreed that the judgment of the lower court is affirmed except that part thereof which is absolute and unqualified in Wilson’s favour on the demand for the amount of the notes, and as to that, that there be judgment in his favour as in case of nonsuit, the appellees to pay costs of appeal.